UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: Michael J. Sandberg, | ) | Bankruptcy No.  20-80615 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| | ) | Judge Lynch |
| | ) | |

## MEMORANDUM OPINION

The United States Trustee moves for the dismissal of the Debtor Michael J. Sandberg's bankruptcy under section 707(b) on the ground that granting relief would constitute an abuse of the provisions of chapter 7 of the Bankruptcy Code.  The Debtor having failed to rebut the presumption of abuse reflected in his Form 122A-2 Chapter 7 Means Test Calculation, the motion will be granted, in part.

## I.  JURISDICTION

The district court has "original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a).  In accordance with 28 U.S.C. § 157(a), the district court has referred this and all other cases under title 11 to this court. N.D. Ill. R. 40.3.1(a). As the motion seeks to dismiss the bankruptcy case, the matter is a core matter over which this court has authority to enter final orders. 28 U.S.C. § 157(b)(2)(A), (O). *See In re Adolph,* 441 B.R. 909, 910 (Bankr. N.D. Ill. 2011).[1]

---

[1] Additionally, both parties affirmed in open court their consent to this court's authority to enter final orders in this matter on September 23, 2019. *See Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, ___, 135 S. Ct. 1932, 1949 (2015).

## II.  BACKGROUND

The Debtor commenced this chapter 7 case on March 24, 2020.  Mr. Sandberg's Form 122A-1 Statement of Current Monthly Income and Form 122A-2 Means Test Calculation filed with his petition indicated "above-median" income giving rise to a presumption of abuse in the case. (ECF Nos. 2, 3.)  On June 15, 2020, the U.S. Trustee moved to dismiss the case under section 707(b).  The matter was fully briefed (ECF Nos. 29, 33, 36, and 42), following which the court held an evidentiary hearing on October 13, 2020.  During the trial, the Debtor and his former spouse testified via videoconference pursuant to Fed. R. Civ. P. 43(a) and the court's Third Amended General Order No. 20-05.[2]  The court also takes judicial notice of the contents of the docket in this matter when appropriate. *See Levine v. Egidi*, No. 93 C 188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Miceli*, 587 B.R. 492, 496 (Bankr. N.D. Ill. 2018) (court could take judicial notice, when appropriate, of the docket of the case and the filings therein).

## III. FINDINGS OF FACT[3]

The court has considered the evidence and arguments presented by the parties at the trial and reaches this decision after careful consideration of the substance and credibility of the testimony and the exhibits admitted in evidence, and any reasonable

---

[2] "For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." Fed. R. Civ. P. 43, made applicable by Fed. R. Bankr. P. 9017.

[3] The following sets forth this court's findings of fact as required by Fed. R. Bankr. P. 7052. Adjudicative facts may also be found and determined later in this Memorandum Opinion.

inferences to be drawn therefrom, together with the stipulations of the parties.  From its review, this court finds the salient facts to be as follows.

The Debtor filed his petition for relief under chapter 7 through counsel on March 24, 2020.  His debts consist primarily of consumer debts.  Mr. Sandberg has lived in a home owned by his girlfriend in Crystal Lake, Illinois, since shortly before the petition date.  He previously lived in Missoula, Montana, where his former spouse lives.  Their two high-school age sons also live in Missoula, where their  sons were born and have lived their entire lives.  Mr. Sandberg shares custody of the sons with his ex-wife ("50/50").  After the couple divorced in 2010, Mr. Sandberg  moved out but continued to reside in Montana until late 2015, when he moved to a location in Idaho, two to three hours away. Dissatisfied with his job in Idaho, he took a position in Illinois and, in 2016, moved to that state.  Other than for a brief period spent in Arkansas in mid-2019, the Debtor has resided in Illinois ever since.

Mr. Sandberg is currently the Director of Field Operations at a construction company, reporting directly to the owner.  He has worked at his current job for approximately four years, a situation he describes as a "stable job" at a "good environment."  He testified that recruiters frequently call him, but in his view, none of the opportunities offered are comparable to his current position.

The Debtor's Form 122A-1 Statement of Current Monthly Income listed his average monthly gross wages to be $9,923.07 during the six calendar months preceding his petition.  He listed no other income.  Mr. Sandberg's statement declared

his annualized income to be $119,076.84, which is greater than the benchmark median income for a household of three in Illinois of $82,268.00. (ECF No. 2.)[4]

Listing above-median income, the Debtor also completed and filed a Form 122A-2 Chapter 7 Means Test Calculation. In it he listed deductions to income totaling $8,041.22. The deductions resulted in his listing $1,881.85 in monthly disposable income, or $112,911 available over the next sixty months. (ECF No. 3.) His Form 122A-2 acknowledges the statutory presumption of abuse arises, but asserts various "special circumstances that justify additional expenses," namely: average monthly expenses of $1,630.00 for "Travel to see minor children (lodging, food, auto rental, airfare)"; $700.00 for "Vehicle Gas and Maintenance for job"; and $345.00 for "Student Loan Payments." (ECF No. 3.)

**The Debtor's Student Loans Expenses.** At trial the Debtor provided evidence that only $265 in monthly student loan payments will come due. It was conceded that the difference between this amount and the listed expense was due to a computational error inasmuch as one of the loans, actually payable quarterly, was mistakenly listed as a monthly obligation.

**Employment-Related Transportation Expenses.** The Debtor's testimony also revealed a misapprehension of his monthly vehicle gas and maintenance expense deduction claimed. It turns out that the $700 figure claimed in his filings did not

---

[4] While the Debtor asserted "3" people in his household, (ECF No. 2), it is not clear whether the two allegedly additional "household" members for purposes of the form were the girlfriend and one son or his two sons. His 2018 and 2019 federal income tax returns both list his status as head of household with one dependent. (Stipulation, ECF No. 45, ¶¶ 29, 30.) Nor is it clear from the testimony and record whether he had previously resided with his girlfriend or shared expenses prior to moving in with her shortly before the petition date.

reflect the Debtor's out-of-pocket expenses, but rather the $700 per month travel reimbursement he is paid by his employer (in addition to scheduled wages). This $700 amount is not reflected in his calculation of monthly income in his Form 122A-1, although his contemporaneously filed Schedule I lists a $700 monthly "Expense Check from Delauter." (ECF No. 1.) Although the Debtor testified that the payment was intended to cover mileage, tolls, wear and tear, fuel, and "everything" related to his driving expenses, he failed to identify or substantiate any specific out-of-pocket expenses he incurs. To the contrary, he testified that he never "added it up."[5] Thus, even to the extent the $700 monthly payment accurately reflects reimbursements for actual driving expenses, the Debtor failed to show that these expenses exceeded the vehicle operation costs he already deducted from income in his means test calculations.

**Claimed Deductions for Family Visits.** With respect to the deduction for periodic family visitations, the Debtor claims that he travels to Montana approximately once a month to see his sons. At trial, the Debtor presented evidence concerning ten trips to Montana he took in 2019. His proof indicated he took one trip in each of January, February, April, May, August, and December, and two trips in October and two in November of that year. He also offered evidence of a single trip to Montana in early February 2020. The longest of the trips, near Christmas 2019, lasted five days. Most lasted only two or three days, with the Debtor typically

---

[5] The Debtor also failed to reconcile the figure he gave here for this expense with his claim in the Form 122A-2 means test calculation for operating costs for two vehicles under IRS Local Expense guidelines totaling $416 per month. Also left unexplained is his entry in that form of $217.00 for "Additional public transportation expense."

arriving either late Friday evening or on Saturday morning, and returning on Sunday. The Debtor's girlfriend travelled with him on less than half of the trips. On those occasions, he testified, she reimbursed him for her airfare and her half of the total expenses incurred.

For these trips, the Debtor's roundtrip airfare including taxes and fees as reflected in the bank records ranged from $352.44 to $731.48, with a single outlier of $1,181, apparently for a trip commencing on Christmas Day. It is clear from the notation in his credit card statement that the December charges totaling $1,181 were for two separate roundtrip tickets, and the Debtor testified that such charge was for both the Debtor and his girlfriend, who he testified later paid him for her ticket. The statement record for the November airline charge similarly breaks the charge into two charges of $338 each. Charges for other trips on other airlines list only a single charge to an airline, though some are as high as $731. From the Debtor's testimony, the court concludes that the airfare in the $600 and $700 range reflected in the Debtor's records are likely for two tickets for which he was later reimbursed, and that therefore the average airfare he actually incurred per trip was more likely in the range of $300 to $400.[6]

The Debtor's parents live in Montana, approximately a thirty-minute drive from the airport. However, the Debtor usually stayed at a hotel located ten minutes

---

[6] It is also possible that some of the charges totaling in the $300 or $400 range may have been for multiple tickets, such that his actual expenses were even lower. For purposes of the motion it is enough to conclude that the Debtor failed to demonstrate he incurred average monthly airfare expenses greater than $400. Indeed, because the evidence showed only ten trips to Montana per year—consistent with the Debtor's testimony that his sons visited him in the summer or they took family vacations instead—the monthly average would be less than the average trip expense.

from the airport.  He explained that he did so because the hotel is more convenient.

The Debtor presented bank and credit card statements which reflected the hotel

expenses for only three of the trips in 2019.  He also testified that when he stayed at

a hotel his sons stayed with him.  The bank and credit card statements show that the

Debtor incurred charges at a Holiday Inn in Montana of $262.17 for the December

2019 trip, $198.95 at the Fairmont Hot Springs for the late November 2019 trip[7] and

$419.02 to Best Western in Montana for the September 2019 trip.  Other than

perhaps in the Debtor's self-prepared credit card and bank summaries, which the

court finds not admissible (*see infra* p. 31), the Debtor did not provide specific or

documentary evidence to substantiate other lodging charges he incurred during his

Montana trips.

Most of his trips were for only one or two nights, and he failed to show that

there was no alternative lodging available for less than $200 per trip.  The Debtor's

testimony concerning these visits—that he usually picked up his sons Friday evening

and they stayed with him until he returned them to their mother on Sunday

morning—was credibly disputed by the testimony of their mother.  She testified that

only occasionally did the Debtor meet his sons on Friday night.

The bulk of the Montana-related expenses shown in the Debtor's bank and

credit card statements involved restaurants, entertainment, shopping, and

unexplained cash advances.  For example, of the documented expenses related to the

---

[7] There is an initial charge of $198.95, followed by separate charges to the Fairmont Hot Springs of $64.30, $35.00, and $12.00.  It is not clear from the record whether the subsequent charges are for amenities or whether such amenities were reasonable and necessary.

Debtor's three-day trip to Montana in late October 2019, of approximately $385 in non-airfare expenses, approximately $160 is for brand clothing stores including American Eagle and Hollister, $120 for restaurants, $25 for movie tickets and $80 for an "escape room" experience. While some of these statements show airport fees, baggage fees, or gas station charges ("airport related expenses"), others do not. But the evidence presented for these trips do not disclose that he incurred airport related expenses exceeding $40.

The Debtor has shown that he typically incurs up to $400 in airfare costs and $40 in incidental travel expenses ten times per year to visit his sons in Montana for an average of about $370 per month in travel-related expenses.

## IV. DISCUSSION

### A. The Means Test Under Section 707(b)(2).

Chapter 13 "enables an individual to" keep non-exempt property and "obtain a discharge of his debts if he pays his creditors a portion of his monthly income in accordance with a court-approved plan." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 64 (2011). Chapter 7, on the other hand, enables the individual debtor to obtain a discharge by giving up current non-exempt property but without devoting future income. 11 U.S.C. § 541(a)(6). Under the 1978 Bankruptcy Code, the "ability of the debtor to repay his debts in whole or in part [did not constitute] adequate cause for dismissal" of a chapter 7 case, as Congress was hesitant "to enact a non-uniform mandatory chapter 13, in lieu of the remedy of bankruptcy." H.R. Rep. No. 95-595, at 380 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6336. Through several

amendments to the Code, and in particular to section 707, Congress implemented a change in perspective such that it may be an "abuse" of chapter 7 for debtors with the ability to pay creditors from income to seek immediate liquidation and discharge through the chapter.

In 1984, Congress added subsection (b) to section 707 to permit dismissal of an individual consumer chapter 7 case where "granting of relief would be a substantial abuse of the provisions of" chapter 7, with a presumption in favor of the debtor. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, § 312, 98 Stat. 333 (1984). Congress again amended section 707(b) in 2005 to remove the limiter "substantial" before "abuse," to remove the presumption in favor of the debtor and instead to set forth a mechanical "means test" which, if failed, creates a presumption of abuse. *See, e.g., In re Amaro*, 2020 Bankr. LEXIS 2751, at *17-18 (Bankr. N.D. Ill. Sept. 30, 2020). The "major objective of Congress in adding the means test in § 707(b)(2) was to limit judicial discretion from the process of determining abuse by providing an objective standard for establishing a presumption of abuse." *Morse v. Rudler (In re Rudler)*, 576 F.3d 37, 50-51 (1st Cir. 2009) (quoting *In re Hartwick*, 359 B.R. 16, 21 (Bankr. D.N.H. 2007)). The means test, "the heart of BAPCPA's consumer bankruptcy reforms," was adopted "to help ensure that debtors who *can* pay creditors *do* pay them." *Ransom*, 562 U.S. at 64.

Section 707(b)(2) now states that "the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under [sub]clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of" (1)

$13,650 or (2) the greater of 25% of the debtor's nonpriority unsecured claims or $8,175. 11 U.S.C. § 707(b)(2). In other words, the presumption of abuse does not arise when the debtor's monthly disposable income after allowable expenses is less than $136.25. Abuse will be presumed, on the other hand, when this amount exceeds $227.50. When the debtor's the monthly disposable income lies between those limits, whether the presumption comes into play will depend on the amount of nonpriority unsecured claims.

The statute specifies in subparts (ii), (iii) and (iv) which expenses may be deducted to determine monthly disposable income. *Id.* Subpart (ii) incorporates the monthly expense amounts and, as applicable, other specified safety, care, and support expenses, specified by the Internal Revenue Service for the area in which the debtor resides as are in effect on the petition date. In addition, the monthly expenses allowable under this subpart may include deduction of certain specific actual expenses beyond the IRS guidelines if documented and shown to be reasonable and necessary, including continuation of actual expenses to care for an elderly, chronically ill or disabled household or family member. If the debtor is eligible for relief under chapter 13, this amount may also include hypothetical chapter 13 trustee fees and other chapter 13 administrative expenses. Subpart (ii) also permits actual expenses not to exceed $2,050 per year per child for a dependent child less than 18 years of age to attend a private or public elementary or secondary school, and home energy costs in excess of the amounts permitted in the guidelines. *Id.* Subpart (iii) allows deduction of average monthly payments on account of secured debts to come due

within the 60 months following the petition date. Finally, subpart (iv) permits deduction of all priority claims (including priority child support and alimony claims) converted into a monthly amount by dividing by 60. *Id.*

The Bankruptcy Code also clearly defines the income side of the equation. Section 101(10A) defines "current monthly income" to broadly include income "from all sources that the debtor receives . . . without regard to whether such income is taxable income," and which "includes any amount paid by any entity other than the debtor . . . on a regular basis for the household expenses of the debtor or the debtor's dependents." 11 U.S.C. § 101(10A).  It permits deduction of only enumerated types of exclusions, none of which are applicable here. 11 U.S.C. § 101(10A)(B)(ii).[8]  This mechanical approach of determining income does not require prediction, for it is backward-looking.  Section 10A specifies that "current monthly income" is based on the average monthly income "derived during the 6-month period ending on . . . the last day of the calendar month immediately preceding the date of the commencement of the case." 11 U.S.C. §101(10A)(A).[9]

### B. The Presumption Of Abuse Arises Here.

The "analysis required by section 707(b) is mainly arithmetical." *In re Schwartz*, 799 F.3d 760, 763 (7th Cir. 2015).  The analysis for this case is generally

---

[8] The Coronavirus Aid, Relief, and Economic Security Act, enacted March 27, 2020, added a fifth category of excluded income for payments with respect to the coronavirus disease 2019, with a sunset provision removing the provision one year after the date of enactment. Pub. L. No. 116-136, § 1113, 134 Stat. 281, 311 (2020).  The petition and Chapter 7 Means Test Calculation were filed in this case on March 24, 2020,  and therefore the CARES Act is not relevant to the income calculation here.

[9] The Debtor filed his required Chapter 7 Means Test Calculation and, therefore, section 101(10A)(A)(ii) and its alternative ending date for the 6-month period does not apply.

not at issue.[10]   The Debtor disclosed in his Form 122A-1 Statement of Current Monthly Income that between September 1, 2019, and February 29, 2020, he had average gross monthly wages, salary, tips, bonuses, overtime, and commissions before payroll deductions totaling $9,923.07.  The statement listed no other income. (ECF No. 2.)  In it, the Debtor claimed a household of three with $119,076.84 in annualized income.  This figure exceeds the published median family income of $82,268.00 for a family of three in Illinois as of the petition date. (*Id.*)  The Debtor's accompanying Form 122A-2 Means Test Calculation acknowledges a household of three.  The form discloses two vehicles: a  2018 Ford F150 with 22,000 miles that is secured by a loan to Chase Auto Finance with average monthly payments for the next 60 months of $620; and another 2018 Ford F150 with the same mileage and no debt. The form also lists a $3,653.00 past-due priority debt, which it divides by sixty months to amount to a monthly debt installment of $60.88.

For the Debtor's expense deductions, the form claims: $1,446.00 for food, clothing and other items based on IRS National Standards; $165 for out-of-pocket health care allowance based on IRS National Standards; $544 for housing, utilities, insurance, and operating expenses based on IRS Local Standards; and $1,665 for mortgage or rent expenses based on IRS Local Standards.  In addition, the Debtor's Means Test Calculation lists $416 for vehicle operation expenses based on IRS Local

---

[10] While the U.S. Trustee has contested certain figures the Debtor used in his means test calculation, the court need not address those issues today.  The Debtor's own figures do not satisfy his initial means test.  Section 707(b)(3) provides that in determining abuse, where the presumption does not arise or is rebutted the court "shall consider . . . whether the debtor filed the petition in bad faith [and] the totality of the circumstances." 11 U.S.C. § 707(b)(3).  But, as discussed below, the Debtor has failed to meet his burden to rebut the presumption of abuse.  Therefore, the court need not reach the U.S. Trustee's alternative totality-of-the-circumstances argument.

Standards and $217 for additional public transportation expenses.  The form lists $2,770.48 for actual monthly federal, state, and local taxes[11] and $72.06 for actual household health insurance expenses.  Finally, Mr. Sandberg included in his expense computations $620 for the average secured car loan payment,[12] $60.88 for the past-due priority claim, and $64.80 for hypothetical monthly trustee fees in a chapter 13 case.  In sum, the Debtor claims a total of $8,041.22 in monthly deductions in his Means Test Calculation, leaving a total of $1,881.85 in monthly disposable income. The Debtor's own figures used in his Means Test Calculation reveal that his monthly disposable household income exceeds the applicable monthly maximum[13] of $227.50 by $1,654.35 per month.  Thus, the presumption of abuse unequivocally arises in this case.

### C. The Debtor Failed To Overcome The Presumption of Abuse.

Upon the movant demonstrating that the presumption of abuse arises, the burden of rebutting that presumption shifts to the debtor. 11 U.S.C. § 707(b)(2)(B); *see, e.g., In re Rowell*, 536 B.R. 245, 251 (Bankr. E.D. Wis. 2015); *In re Planck*, 2017

---

[11] In its instructions, Form 122A-2 makes clear that if the amount claimed is based on the monthly amount withheld from pay, "you must divide [any] expected refund by 12 and subtract that number from the total monthly amount that is withheld." (ECF No. 20.)

[12] While the Debtor listed a $508 ownership cost under IRS Local Standards in response to an earlier item, he chose to use the higher $620 debt payment deduction for purposes of his calculation presumably because his claim of average secured debt payment exceeded this amount. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I) ("Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts."). *See also, e.g., In re Scott*, 457 B.R. 740, 745 (Bankr. S.D. Ill. 2011) ("By directing debtors to subtract their monthly vehicle loan payment from the I.R.S. Standard at lines 28(b) and 29(b), the form ensures that the 'monthly expenses of the debtor[s] [do] not include any payments for debts.' Permitting debtors to then include these loan payments at line 47, which mirrors the language of § 707(b)(2)(A)(iii), gives effect to all sections of the statute.")

[13] In his bankruptcy schedules, the Debtor lists $120,075.03 in non-priority unsecured debt, which if accepted, means that 25% of his non-priority unsecured debt exceeds $13,650, such that the alternative threshold for determining abuse based on non-priority unsecured debt would not apply.

WL 3575651, at *4 (Bankr. C.D. Ill. Aug. 3, 2017). The "presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B)(i).

The Bankruptcy Code does not define the term "special circumstances." The two examples given in section 707(b)(2)(B), a serious medical condition or a call to active duty in the Armed Force, are prefaced by the words "such as" and courts "generally agree that the statute's examples of 'special circumstances' are non-exclusive and merely illustrative." *In re Harmon*, 446 B.R. 721, 728 (Bankr. E.D. Pa. 2011) (listing cases). While some courts have suggested from the two listed examples that circumstances should be beyond the debtor's control, "nothing in § 707(b)(2)(B)(i) absolutely requires that a 'special circumstance' arise as the result of an event beyond the debtor's reasonable control," and this court "will not read into § 707(b)(2)(B)(i) an involuntariness prerequisite." *See In re Burggraf*, 436 B.R. 466, 472 (Bankr. N.D. Ohio 2010). Elsewhere, where Congress intended a lack of control or similar requirement, it has so stated. *See, e.g.*, 11 U.S.C. §§ 1328(b)(1) (requirement for "hardship discharge" includes that failure to complete plan payments must be "due to circumstances for which the debtor should not justly be held accountable"); 328(a) (compensation of professional may be modified only if improvident "in light of developments not capable of being anticipated"). Also, as noted by some courts, the

two statutory examples are not inherently involuntary or unanticipated, as a "serious health condition could stem from a self-inflicted injury, and an individual called to active duty could have voluntarily enlisted as a reservist." *In re Haman*, 366 B.R. 307, 313-14 (Bankr. D. Del. 2007) (quoting *In re Thompson*, 350 B.R. 770, 777 (Bankr. N.D. Ohio 2006)).

The debtor must specifically "itemize each additional expense or adjustment of income" and provide "documentation for such expense or adjustment to income" and "a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable." 11 U.S.C. § 707(b)(2)(B)(ii).  He must "attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required." *Id.* § 707(b)(2)(B)(iii).  Finally, the itemized and documented additional expenses or adjustments to income must be shown to cause the debtor's current monthly income to fall within the threshold specified in the means test. *Id.* § 707(b)(2)(B)(iv). Therefore, to rebut the presumption of abuse arising in this case, Mr. Sandberg must demonstrate "special circumstances" that justify additional expenses or adjustments to income "for which there is no reasonable alternative," and specifically identify, itemize and prove that such expenses or adjustments are necessary and reasonable and collectively exceed $1,654.35 per month.

The Debtor's Means Test Calculation identifies three categories of expenses as "special circumstances": "Travel to see minor children (lodging, food, auto rental, airfare) $1,630.00, Vehicle Gas and Maintenance for Job $700.00, and Student Loan

Payments $345.00." (ECF No. 3.)  In response to this motion, the Debtor filed his affidavit on August 4, 2020, explaining that he previously resided in Montana for approximately 20 years with his former spouse, has children from that marriage who have resided in Montana for their entire lives, divorced his former spouse at some point, and moved to Illinois approximately four years ago after obtaining a job in Crystal Lake, Illinois. (ECF No. 33.)  Notably, the Debtor did not comply with the procedural requirements set out in section 707(b)(2)(B)(ii) and (iii) for rebutting the presumption of abuse.  His Form 122A-2 does not itemize his alleged additional expenses in any detail, nor did he attach any documentation to support the alleged special circumstances.  Nor does his subsequent affidavit, which also did not attest to the accuracy of the information provided or the claim that the alleged additional expenses or adjustments are required.

Nonetheless, at the parties' request, the court conducted an evidentiary hearing at which the Debtor and his former spouse, Ms. Vance, testified.

In analyzing a claim for adjustment under section 707(b)(2)(B), the "focus must be on whether the debtor is, of necessity, in a different situation than the typical debtor addressed by the IRS guidelines." *In re Jackson*, 2020 Bankr. LEXIS 2207, at *13-14 (Bankr. N.D. Tex. May 4, 2020).  The means test incorporates policy determinations as to the reasonable types and amounts of expenses made by Congress or, by delegation, the IRS.  Where a common type of expense in common situations is not provided for in the means test, it is reasonable to believe that Congress or the Service considered such expense and intentionally omitted it.  On the

other hand, section 707(b)(2)(B) functions as a partial safeguard for unintended or unanticipated but unjust consequences of the mechanical and otherwise inflexible means test. *See, e.g., In re Carrillo*, 421 B.R. 540, 545 (Bankr. D. Ariz. 2009) ("Congress included the 'special circumstances' exception as a safeguard to allow courts to consider additional expenses or reductions in income not accounted for in the means test that would prevent meaningful repayment of a debtor's obligations under a Chapter 13 plan."). This exception may, therefore, apply to situations that Congress or the Service did not contemplate or predict. Or to situations sufficiently rare or fact-dependent that it was seen as better to leave the determination to a case-by-case basis.

The court now will address in turn each of the three categories of amounts that the Debtor asserts as justifiable additional expenses.

### 1. Claimed Student Loan Debt.

The Debtor first argues that he should be entitled to deduct monthly student loan payments of $345.00 from his means test calculation as a "special circumstance." At trial, however, the Debtor provided evidence to establish required payments of only $265 per month. The Debtor's testimony and bank statements showed that during the six months leading up to his petition date he paid the University of Montana or its loan servicer approximately $120[14] quarterly and paid Nelnet a monthly amount of $225.00. (Exs. 7, 9.)

---

[14] The Debtor's bank statements reflect the Debtor made one payment of $120 and one payment of $120.99 during these six months.

However, the Debtor failed to demonstrate that his pre-petition contractual obligation to make current payments on these student loans constitutes a "special circumstance" for purposes of section 707(b). As noted above, the statute does not define the term "special circumstances." A number of early cases interpreting section 707(b)(2)(B) did find that the non-dischargeability of a pre-petition student loan constituted a "special circumstance," but after reviewing the statute and subsequent case law, the court finds such reasoning to be inconsistent with the statute, at least as applied to the Debtor's loans.

The Debtor relies primarily on *In re Martin*, 371 B.R. 347 (Bankr. C.D. Ill. 2007), to argue that non-dischargeable student loan debt should be deducted from his means test calculation. Acknowledging the "rapidly developing case law" at the time, the *Martin* court relied upon three other 2007 cases to conclude that student loans may constitute a "special circumstance." *Id.* at 355-56 (citing *In re Templeton*, 365 B.R. 213 (Bankr. W.D. Okla. 2007); *In re Haman*, 366 B.R. 307 (Bankr. D. Del. 2007); *In re Delbecq*, 368 B.R. 754 (Bankr. S.D. Ind. 2007)). More recent decisions, however, have not embraced this view. *See, e.g., In re Hanks*, 618 B.R. 185 (Bank. W.D. La. July 20, 2020); *In re Martin*, 505 B.R. 517 (Bankr. S.D. Iowa 2014); *In re Brown*, 500 B.R. 255, 262 (Bankr. S.D. Ga. 2013); *In re Maura*, 491 B.R. 493, 513); *Harmon*, 446 B.R. at 730. Representative of this approach is the determination in *In re Polinghorn* that student loans "are commonplace and therefore cannot be said to constitute highly unusual circumstances, or the type of circumstance not normally encountered by many debtors." 436 B.R. 484, 490 (Bankr. N.D. Ohio 2010). And, as the court noted

in *Hanks,* "[i]f nondischargeability were the test for special circumstances, then this factor alone would swallow the entire rule in most student loan cases." 618 B.R. at 191.

Some of these cases focus on the term "special" and find student loans to be too common to qualify.   For example, a 2011 Wisconsin bankruptcy court noted that "commonplace . . . student loans to fund higher education . . . are not 'special,' as they are part of the financial picture of many Americans," but suggested that if it could be "demonstrated that the student loans were incurred as a result of a serious medical condition, employer closing, or other similar 'special' situation," they might qualify. *In re Johnson*, 446 B.R. 921, 925 (Bankr. E.D. Wisc. 2011).  Others focus more on the illustrative examples of call to active military duty or serious medical condition found in the legislative history to conclude that expenses must be due to an unexpected or involuntary circumstance, which student loans rarely are. *See, e.g., Hanks,* 618 B.R. at 192.  The Seventh Circuit has not directly addressed this point.  As discussed in the previous section, this court does not find a bright-line rule requiring circumstances to have been based on involuntary or unexpected events.

This court agrees with the recent majority that it is inconsistent with the statute to permit deduction on account of pre-petition student loans as a "special circumstance" solely because of the non-dischargeable nature of the debt.  There can be no question that the "special circumstances" provision is not a back door for broad, common categories of expenses that Congress and the IRS chose not to include in section 707(b)(2)(A).  Thus, the mere fact that a debt is non-dischargeable or was an

educational loan is insufficient.  However, this court must differ slightly from the reasoning of some decisions that rest on the origin of the debt and the ultimate legal liability on that debt, given that the statute's attention rather is on the reasonableness of the *monthly expense* for the sixty months following the petition date.  The pre-petition student loan debt being ordinarily subject to the automatic stay during the course of the bankruptcy proceeding, the ultimate dischargeability of such debt bears little relationship to the ultimate issue here, that is the debtor's ability to devote income for sixty months to repayment of nonpriority unsecured debts.

The Bankruptcy Code refers to adjustments based on "additional *expenses* or adjustments of current monthly income for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B) (emphasis added).  The Debtor does not seek an adjustment to calculation of income, but rather asserts additional monthly "expenses" of between $265 and $345 for payment on pre-petition student loans.  The word "expense" is defined both generally as a "financial burden or outlay" and as "something expended *to secure a benefit or bring about a result.*"[15]  The fact that section 707(b)(2)(B) permits deduction only of monthly additional expenses "for which there is no reasonable alternative" highlights that the debtor must demonstrate some benefit obtained or detriment avoided by devoting future income to such expense rather than

---

[15] *See* https://www.merriam-webster.com/dictionary/expense, last accessed Dec. 15, 2020 (emphasis added); s*ee also, e.g.*, EXPENSE, Black's Law Dictionary (11th ed. 2019) ("An expenditure of money, time, labor, or resources *to accomplish a result.*" (emphasis added)).

to repayment of debts.  If there is no consequence to not paying the "expense," it follows then that not making payment is a "reasonable alternative."

Virtually all of the enumerated expense categories in the means test and IRS guidelines, such as housing expenses, food, clothing, childcare expenses, healthcare expenses and transportation expenses, are necessary for the health and wellbeing of the debtor and her dependents.  In finding that an "unjustified refusal to pay one's debts" pre-petition despite the ability to do so is "cause" to dismiss a chapter 7 case under section 707(a), the Seventh Circuit acknowledged that a debtor is not required "to live in a tent, dress in rags [or] drive a 1950 Chevy." *In re Schwartz*, 799 F.3d 760, 763 (7th Cir. 2015).  The means test similarly provides for sufficient expense amounts for average debtors to live above mere-subsistence levels.  But it does not generally provide for payments of pre-petition unsecured educational debts.

Nor has the Debtor identified any impact on the health and wellbeing of himself or his dependents.  The Debtor appears to have obtained his educational benefits years before his bankruptcy and has not alleged any reasonably necessary benefit that he or his dependents will be deprived of if monthly payments are not made, or if payments on such debt are made together with payments of other pre-petition unsecured debts through a chapter 13 plan.  To the contrary, he testified that he did not know why his student loans would constitute a "special circumstance" other than that he would continue to have them post-discharge and continue to make the payment.

Both *In re Martin*, and *In re Templeton*, 365 B.R. 213 (Bankr. W.D. Okla. 2007), one of the cases relied upon by *Martin*, reason that because a student loan is non-dischargeable in both chapter 7 and 13, the debtor has "no reasonable alternative other than to pay the debt." *Martin*, 371 B.R. at 356. But the issue under the statute is whether there is a reasonable alternative to making the monthly payment that the debtor seeks to deduct from the 60-month calculation. *In re Delbecq* further suggests that, if no payments are made during a 60-month plan, interest will continue to accrue, and the undischarged debt will be even larger at the end of the plan. 368 B.R. at 759. But that does not explain why the student loans would be entitled to payment of principal or interest ahead of and at the expense of other unsecured creditors. In bankruptcy, unsecured creditors are in general no longer entitled to contractual interest on their claims after the petition date. *Matter of Fesco Plastics Corp., Inc.*, 996 F.2d 152, 155 (7th Cir. 1993) ("[C]reditors cannot recover post-petition interest on their claims. This rule has been written into the Bankruptcy Code at 11 U.S.C. § 502(b)(2).").

Chapter 13 (or if ineligible, chapter 11) offers an alternative, for the automatic stay would prevent a pre-petition creditor such as the holders of the educational loans at issue here from taking collection efforts inconsistent with the plan until completion or dismissal of the case. *See* 11 U.S.C. § 362(a) (scope of the stay), § 362(c) (stay remains in effect until case is closed or dismissed or debtor receives discharge, which in chapter 13 is generally at end of plan). A debtor may modify the rights of the holders of unsecured claims through her chapter 13 plan. *Id.* § 1322(b)(2). And such

plan, if confirmed, is binding on all creditors "whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." *Id.* § 1327(a). That an unsecured claim is non-dischargeable under section 523 or 1328 means that the creditor is not enjoined from seeking to collect against the debtor after the debtor obtains a discharge and the case is closed, but such creditors do not have special priority to receive payments ahead of other unsecured creditors. *See id.* § 507 (not listing student loans among claims entitled to priority). Thus, even if the Debtor here is ultimately required to repay non-dischargeable debts, he has not explained why the presence of his student loans makes him unable to make payments from income into a chapter 13 plan.

It is the Debtor's burden to demonstrate special circumstances and lack of a reasonable alternative to the asserted expenses. Here, the Debtor has not provided any information as to whether his student loans are long-term loans nor any indication as to what type of plan he could or would propose in chapter 13. The court therefore need not determine in the abstract whether any possible plan under chapter 13 would be confirmable, for the Debtor has failed to meet his burden of showing chapter 13 not to be a reasonable alternative.

Moreover, *Delbecq's* and *Martin's* proposition that chapter 13 is an insufficient alternative because of the possibility that a debtor could propose a plan that pays student loans or other non-dischargeable general unsecured claims ahead of dischargeable general unsecured claims ignores the fact that such non-dischargeable general unsecured claims are among the intended beneficiaries of the means test.

The means test ultimately evaluates the amount of disposable income available over the 60 months following the petition date to pay the nonpriority unsecured claims. This function is most clearly evident in sections 707(b)(2)(A)(i)(I) and (B)(iv)(I), which compare the calculated disposable 60-month income to "25 percent of the debtor's nonpriority unsecured claims." It is also seen in section 1325(b)(i) which allows "the holder of an allowed unsecured claim" to object to a proposed chapter 13 plan that does not provide for payment in full or contribution of "all of the debtor's projected disposable income to be received in the applicable commitment period . . . to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b). With respect to above-median debtors like the Debtor here, that projected disposable income is calculated with reference to section 707(b)(2)(A) and (B). *Id.* § 1325(b)(3). Thus, if the Debtor has sufficient disposable income to make significant payments over the next 60 months on his nonpriority general unsecured student loan claims through a chapter 13 plan, that is more reason the case belongs in chapter 13 instead of chapter 7, not less. *See, e.g., In re Martin*, 505 B.R. 517, 522 (Bankr. S.D. Iowa 2014) (concluding that a "reasonable alternative exists" where a debtor has sufficient income to "enter into a chapter 13 plan which would allow them to make payments to all creditors, including their student loan lenders.").

Finally, it is notable that while the means test provides for the debtor's "monthly expenses" under the IRS's National Standards and Local Standards as primary sources for the deductions to be applied in the means test, the statute adds the express limitation: "[n]otwithstanding any other provision of this clause, the

monthly expenses of the debtor shall not include any payments for debts." 11 U.S.C. § 707(b)(2)(A)(ii)(I). *See, e.g., Martin*, 505 B.R. at 522 (noting that "section 707(b)(2)(B) requires a debtor to demonstrate *additional expenses* for which there is no reasonable alternative" and "Congress specifically excluded *debts* from the list of expenses that can be considered special circumstances"). While similar limiting language is not found elsewhere in section 707(b)(2), the statute's description of the means test expressly contains deductions only for two distinct types of pre-petition debts: secured claims and priority claims. 11 U.S.C. § 707(b)(2)(A)(iii). Subsection (iv) permits deduction of the "debtor's expenses for payment of all priority claims (including priority child support and alimony claims) shall be calculated as the total amount of debts entitled to priority, divided by 60." *Id.* § 707(b)(2)(A)(iv).

Had Congress intended to broadly permit a deduction for either non-dischargeable claims or claims based on educational debts, no doubt it would have similarly provided a deduction, including an indication of how the expense should be converted into a monthly amount. Indeed, in the same 2005 amendments that added the means test, Congress made substantial changes to section 523(a)(8), expanding the non-dischargeability of educational loans to cover certain loans not insured or guaranteed by a governmental unit, and other changes to section 523 and section 1328, including expanding the number of exceptions to discharge under section 523(a) that are subject to a chapter 13 discharge. Given the prevalence of student loans,[16]

---

[16] According to amici cited by the 3rd Circuit, an estimated 43 million Americans currently owe over $1.4 trillion in federal student loans. *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 281 n.6 (3rd Cir. 2020).

and that Congress was discussing and contemplating their treatment in bankruptcy at the time, one would have expected the statute to include an express exclusion if intended rather than silently imply one in the phrase "special circumstances."[17] *See, e.g., Harmon*, 446 B.R. at 730 ("Had Congress intended to render payments on all categories of nondischargeable debts as allowable expenses under §707(b)(2)(A), it would have been simple enough to do so expressly."). Policy arguments as to the priority or non-dischargeability of student loans or as to whether those with high income but large student loans are more entitled to a chapter 7 discharge being better addressed to the legislature, we decline to expand the scope of the deductions as the Debtor urges.

### 2. Claimed Additional Job Transportation Expenses.

The Debtor next claims a $700 per month expense for "Vehicle Gas and Maintenance for Job." (ECF No. 3.) The Debtor, however, fails to provide corroborating evidence to support his scant testimony about this item. Indeed, the evidence provided shows that Mr. Sandberg is reimbursed by his employer for this expense, but did not account for the reimbursement in his means test calculations of his total household income.

Mr. Sandberg's Schedule I lists $9,999.99 for "monthly gross wages, salary, and commissions" plus $700 as "Other monthly income." (Ex. 1.) His schedule describes the latter item to be "Expense Check from Delauter." (*Id.*) His Schedule J includes a

---

[17] Although more often used in the context of arguments that technical amendments have substantive effect, one is reminded of the Supreme Court's oft-stated reminder that "Congress does not hide elephants in mouseholes." *Cyan, Inc. v. Beaver Cty. Employees Ret. Fund*, 138 S. Ct. 1061, 1071-72 (2018).

corresponding $700.00 per month item listed as "Other" expense for "Gas and Maintenance on Vehicle for Work." (*Id.*) At trial, the Debtor testified that each month he receives $700 from his employer that is intended to cover mileage, tolls, wear and tear, fuel, and "everything" related to his driving expenses. While he believes the reimbursement to be "pretty fair," he admitted that he never "added it up." No documentary evidence of either the expenses incurred or the reimbursement received was offered at trial.

The Debtor's Form 122A-1 Statement of Current Monthly Income, however, does not disclose the $700 monthly reimbursement. It lists $9,923.07 as his "gross wages, salary, tips, bonuses, overtime, and commissions," and $0.00 for "All amounts from any source which are regularly paid for household expenses of you or your dependents, including child support." (ECF No. 2.) The $9,923.07 figure for "gross wages," which he also states to be his total current monthly income in his Form 122A-1 and 122A-2 forms, is slightly less than the $9,999.99 he lists as gross wages in his Schedule I. At trial, Mr. Sandberg did not account for this discrepancy.

The court must conclude from the evidence presented that the Debtor does not show that he incurs unreimbursed vehicle gas and maintenance expenses and has not properly accounted for the reimbursement he does receive in his means test calculation. Accordingly, the court finds that the Debtor has not demonstrated that he is entitled to the "special circumstance" adjustment he claims for employment-related vehicle gas and maintenance expenses.

### 3. Claimed Family Visitation Expenses.

Mr. Sandberg has two teenage sons who live with their mother in Montana. The Debtor lastly argues that he should be permitted to deduct an additional $1,630 representing the average monthly "lodging, food, auto rental, airfare" that he claims to incur on monthly trips to visit his sons as part of his means test calculation. The Debtor urges the court to "consider" the reasoning in the 2007 decision of the bankruptcy court of the Southern District of Ohio, *In re Graham*, 363 B.R. 844, to allow the deduction of these expenses as a special circumstance incurred in "furtherance of maintaining the family unit and meeting one's obligation as a parent." (ECF No. 29 at 6 (quoting *In re* Graham, 363 B.R. at 853).) Here too, however, the Debtor failed to establish that he may take such deductions for his means test calculation.

Several courts have recognized as a general proposition that maintaining separate households due to divorce or legal separation may constitute "special circumstances" permitting at least in some cases deduction for additional expenses not accounted for by the means test and for which there is no reasonable alternative. *See, e.g.*, *In re Crego*, 387 B.R. 225 (Bankr. E.D. Wis. 2008) (overruling chapter 13 trustee's objection to confirmation); *In re Crabtree*, 2007 Bankr. LEXIS 3581 (Bankr. D. Mont. Oct. 12, 2007) (finding chapter 13 debtors could properly assert as an additional expense husband's $600 per month rent for an additional apartment where Debtors were living apart due to irreconcilable differences); *In re Armstrong*, 2007 Bankr. LEXIS 1812 (Bankr. N.D. Ohio May 24, 2007) (joint chapter 7 debtors were

permitted to assert as additional expenses reasonable expenses for maintaining a second household where debtors were legally separated).

Those cases all involved joint debtors claiming expenses for maintaining two separate households, not expenses for traveling between households.  However, the court in *Graham* did allow the deduction of frequent travel expenses where joint chapter 7 debtors maintained separate households.  In *Graham,* the husband's business had failed and despite diligent search he could only find employment in Virginia.  The wife could not move out of state from their Ohio residence or she would lose custody of her two teenage children from a previous marriage.  In addition to finding the extra housing and utility expenses to be reasonable and necessary, the court also permitted a further deduction for the husband's average monthly expenses for traveling from Virginia to Ohio and back two to three times per month at an average cost of $160.00 each way.  The court found that the husband's "expense to commute home on weekends is a reasonable and necessary expense." 363 B.R. at 853.  However, the court also found that there was "no evidence" that the debtors maintained an extravagant lifestyle, and listed nothing on their schedules for recreation, entertainment, newspapers, or magazines. *Id.*  It is also noteworthy that in that decision the court found that the debtors had likely understated, not overstated, their travel expenses, as while the wife testified that she traveled once or twice per month to Virginia for visits, they did not include those expenses in their deduction for household expenses. *Id.*

This court need not determine today whether the reasoning in *Graham* extends to a single, divorced debtor who travels to visit children living out of state for a day or two.  For even if it were to do so, the Debtor has not demonstrated necessary and reasonable expenses directly attributable to such travel sufficient to rebut the presumption.  Unlike in *Graham*, the Debtor here seeks to deduct not only travel expenses such as gasoline, tolls, taxis, and airfare, but a wide range of expenditures he made during or related to his trips.  He failed to sufficiently and credibly document the specifics of particular expenditures or present in his testimony a detailed explanation for the reasonableness and necessity for the deduction sought as required by section 707(b)(2)(B).

**Evidence of Travel Expenses Offered by the Parties.**  At trial, the U.S. Trustee offered and the court received, without objection: copies of monthly billing statements on the Debtor's Alaska Airlines branded Visa credit card from August 15, 2019, through March 14, 2020 (Ex. 10), and copies of monthly statements for the Debtor's JPMorgan Chase checking account from December 20, 2018, through May 19, 2020. (Ex. 9.)  In addition, the U.S. Trustee presented two simple spreadsheets prepared by the Debtor: one entitled "Credit" that purported to list transactions between December 27, 2018 and February 7, 2020 (Ex. 11), and the other, "2019 Checking", that purported to summarize transactions related to the Debtor's checking account between January 5, 2019 and December 29, 2019. (Ex. 12.)

It is unclear for what purpose either of the parties offered the two self-made summaries for which scant foundation testimony was offered.  It is not clear when or

why the summaries were prepared, and neither party suggested that these hearsay statements constitute records of a regularly conducted activity. *See* Fed. R. Evid. 803(6). Moreover, these items have not been shown to be summaries "to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. It has not been shown that the underlying documents are voluminous. *See United States v. Carr*, 965 F.2d 408, 412 (7th Cir. 1992). To the contrary, the court received copies of seven months of credit card statements, and there is no indication that the additional eight months to cover the period of the "Credit" summary could not be conveniently examined. Additionally, the underlying statements contain useful information that does not appear in the summaries, including the city and state of the vendor and information about the details of the airline ticket purchases, and are more credible than summaries prepared by the Debtor for these proceedings.[18] Accordingly, the court does not rely upon the Debtor's self-prepared summaries.

It is not clear if the parties intended to offer the items as "pedagogical summaries" rather than as evidence under Rule 1006. If that is the case, the court finds they do not facilitate the presentation of evidence already in the record and are

---

[18] For example, while most of the transactions listed in the "Credit" summary match charges listed on the Alaska Air Visa statements provided, there are entries for "Uber" on the summary for dates within the range of billing statements received but which do not appear on the credit card statements. This casts in doubt the list of purported charges for the period from December 27, 2018, through August 14, 2019, included on the summary but for which no actual statements were provided. Additionally, because most of the entries in the summary include sparse descriptions, such as seven entries for June 3, 2019, all simply stating "United," there is no way to discern whether they relate to trips to Montana. To the contrary, according to the testimony of the Debtor, the June 3 or other entries may have related to a vacation trip to Florida. The Debtor has offered no reasonable explanation why a vacation to Florida would constitute a "special circumstance" justifying deduction in the means test.

not useful, as they include non-Montana-related transactions, including payments to a law firm and payments for annual memberships at an amusement park just north of Chicago, Illinois. *See, e.g.*, *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013) (explaining that "pedagogical summaries" are not substantive evidence).

**Airfare Expenses for Family Visitations.**  The Debtor's bank and credit card statements indicate that in calendar year 2019 the Debtor took ten trips to Montana, one in each of January, February, April, May, September and December, and two trips in each of October and November.  For these trips, his roundtrip airfare including taxes and fees as reflected in the bank records ranged from $352.44 to $731.48, with the exception of one trip with airfare charges totaling $1,181, apparently for travel on Christmas Day.  It is clear from the notation in the credit card statement that the $1,181 transaction involved the purchase of two separate roundtrip tickets, which the Debtor explained during his testimony, were for both the Debtor and his girlfriend.  According to the Debtor, his girlfriend later reimbursed him for her ticket.[19]  From the Debtor's testimony, the court concludes that the airfare in the $600 and $700 range reflected in the Debtor's records are likely for two tickets for which he was later reimbursed.  The court finds, therefore, that the ordinary airfare expense incurred by the Debtor to visit his sons was shown to be in the range of $300 to $400 per trip.

---

[19] The Debtor testified that his girlfriend travelled with him to Montana somewhat less than half the time and that they always divided expenses 50/50 by reconciling expenses at the end of each month. The statement record for the November airline charge similarly breaks the charge into two charges of $338 each.  Charges for other trips on other airlines list only a single charge to an airline, though some are as high as $731 ($684 plus a charge to a ticket broker of $47.48 on the same day).

**Lodging and Other Expenses Claimed for Family Visitations.**  The bank and credit card statements show that the Debtor incurred charges at a Holiday Inn in Montana of $262.17 for the December 2019 trip, $198.95 at the Fairmont Hot Springs for the late November 2019 trip, and $419.02 to Best Western in Montana for the September 2019 trip.  The Debtor did not provide specific or documentary evidence to substantiate any other lodging charges he may have incurred during his Montana trips.  Most of his trips were for only one or two nights, and he failed to show that there was no alternative lodging available for less than $200 per trip.  Indeed, he testified that he still had family in the area, including his parents, and while he testified that a hotel was more convenient because it was close to the airport, he did not show that it was necessary.

The evidence presented at trial did not present convincing proof of the necessity or the reasonableness for the claimed expenses for these travel accommodations.  According to the Debtor, he usually flew to Montana on Friday night, picked up his sons on the way to the airport and then dropped them off at home on Sunday morning before catching his return flight.  This is contrary to his ex-wife's testimony that sometimes the sons would stay with Mr. Sandberg on Friday nights, but other times he would pick them up on Saturday morning.  In either case the sons would return to her home Saturday evening.  And while the Debtor also testified as explanation for his frequent but very short trips to Montana that he returned to attend his sons' sporting events, graduations and other important life events, his ex-wife credibly testified that that was not the case because those events usually took

place on weekdays while the Debtor usually visited on weekends.  For example, she testified without contradiction that in the previous two years Mr. Sandberg attended a school or sports event during less than half of the trips.  Noting the Debtor's tendency to exaggerate single events as the norm in his testimony, the court finds the Debtor's ex-wife's testimony as to the usual arrangement more credible.

The bulk of expenses shown in the Debtor's bank and credit card statements in Montana or in connection with his trips to Montana were for restaurants, entertainment, shopping, and unexplained cash advances.  For example, of the documented expenses related to the Debtor's three-day trip to Montana in late October 2019, of approximately $385 in non-airfare expenses, approximately $160 is for brand clothing stores, $120 for restaurants, $25 for movie tickets and $80 for an "escape room" experience.  Even if the need to see minor children living apart can be seen as a special circumstance justifying travel expenses, the Debtor has not explained why brand-name clothing, movie tickets and other entertainment or restaurants charging $20 to $80 fall within that category.  The IRS National Standards—which are incorporated into the means test—already factor in household expenses for food, apparel, personal care products and services, and miscellaneous expenses.  The Debtor claimed a household of three even though none of his sons live with him.

For some of the trips his bank and credit card statements show airport fees, baggage fees, or gas station charges.  But for other trips his statements do not, and for none of his trips do the total of such documented ordinary travel expenses exceed

$40. Thus, the Debtor has at best shown that he incurs up to $400 in airfare costs and $40 in incidental travel expenses ten times per year to visit his sons in Montana. This amounts to an average of only approximately $370 per month in travel-related expenses. Even if the court were to give the Debtor all benefit of the doubt, on both the factual issue of actual expenses and the legal issue of whether such expenses were reasonable and necessary, constituted special circumstances and were without reasonable alternative, the deduction of the amount of such expenses established by his evidence remains insufficient to rebut the presumption of abuse. The deduction now sought for the family travel demonstrated by the Debtor amounts to far less than the $1,654.35 per month by which the Debtor's own means test showed he exceeded the threshold. *See* 11 U.S.C. § 707(b)(2)(B)(iv). Indeed, even were Mr. Sandberg allowed to include with this and also deduct his asserted student loan and additional vehicle expenses, he would still fall short of the threshold for rebutting the presumption.

## V. CONCLUSION

For the reasons set forth herein, the court finds that granting relief to the Debtor would be an abuse of the provisions of chapter 7. After the court took this matter under advisement, the Debtor requested the conversion of this case to chapter 13. (ECF No. 56.) In response, the U.S. Trustee stated on the record that he does not oppose the Debtor's motion. Accordingly, pursuant to 11 U.S.C. § 707(b)(1), the court will grant the U.S. Trustee's motion, in part, but will convert the case to chapter 13

with the debtor's consent rather than dismiss the case at this time. A separate order

will be entered to give effect to this decision.


DATE: March 24, 2021


ENTER:

_____
Thomas M. Lynch
United States Bankruptcy Judge